URSILLA A. FORSTER, Plaintiff, *v.* WILLIAM A. FORSTER, Defendant.

Supreme Court, Monroe County, February 9, 1944.

*Nicholas E. Brown* for plaintiff.

*Thomas Harold Crone* for defendant.

VAN VOORHIS, J.  On November 18, 1941, plaintiff obtained a judgment of separation against the defendant in this court which provided for alimony in the sum of $15 per week. Both were residents of New York State.  On July 13, 1943, defendant obtained a judgment of divorce against plaintiff in Nevada upon a ground other than adultery by constructive service of process without the appearance of the wife in the action.  It is admitted that $314.89 was due and payable in accrued alimony at the time when the Nevada decree was entered.  Defendant makes no excuse for violating the judgment of separation in failing to pay this amount.  The only contested question on the motion is whether defendant's Nevada divorce was effectual to dissolve the marriage and thus terminated the New York judgment of separation so as to prevent the accrual of subsequent alimony.  Plaintiff asks for sequestration for the alimony accruing both before and after that divorce.

The validity of the Nevada decree depends upon whether the matrimonial *res* was in that State.  Under settled principles no personal judgment can be obtained against a nonresident upon constructive service without an attachment of property within the jurisdiction of the court or personal appearance by the defendant in the action.  (*Pennoyer* v. *Neff*, 95 U. S. 714.) No judgment for alimony, for example, could be enforced extraterritorially on that basis.  But divorce decrees " are more than in personam judgments.  They involve the marital status of the parties.  Domicile creates a relationship to the state which is adequate for numerous exercises of state power.  [Citing cases.]  Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders."  (*Williams* v. *North Carolina*, 317 U. S. 287, 298.) The case last cited recognizes that it is necessary that at least one spouse be domiciled within the State which grants the divorce.  To the extent that status is affected, such actions are in rem.  (*Matter of Holmes*, 291 N. Y. 261.)  The marital status is the " *res* ".

It is believed that no distinction exists in this respect in the law before and after *Williams* v. *North Carolina* (*supra*). The change has not been in the principle that the matrimonial *res* must be present in the State whose courts act so as to alter it, but rather in the rules for determining its locality. This is not an occasion to analyze the complicated reasoning in *Haddock* v. *Haddock* (201 U. S. 562) whereby it was attempted to give to the marital status a local habitation and a name. Sometimes, where the spouses were living separately, the " res " was held to follow the domicile of the husband only, conferring jurisdiction exclusively upon the courts of the State in which he was permanently or indefinitely located. In other instances the " res " was deemed to follow the domiciles of both husband and wife, and thus be capable of being present in two States at the same time, conferring concurrent jurisdiction to alter the status upon the courts of both. Since *Williams* v. *North Carolina* (*supra*) the latter is always the situation. The legal fiction has been abolished whereby the domicile of the wife was identified with that of her husband where the separation has been due to her fault. In that event she now carries the matrimonial *res* to her domicile just as he also carries it to his own. Both are characterized by the marital status, which does not belong exclusively to either, and of which each may be said to be seized *per tout et non per my,* as in the case of real estate which they own as husband and wife under tenancy by the entirety.

When the default divorce was granted between these parties, the Nevada court decided *in limine* that the husband was domiciled in Nevada. The decision of this motion depends upon whether the full faith and credit clause of the Federal Constitution obliges the New York courts to accept that determination as conclusive. That the party obtaining the divorce must have been domiciled in Nevada is indisputable; the *Williams* case (*supra*) affirms that principle. The question is whether the determination made by the Nevada court is binding upon this court of the jurisdictional fact of his domicile in Nevada. That it is reserved to the courts of one State to attack collaterally the judgments of courts of other States in divorce suits on the ground of lack of domicile of the plaintiff, has been held in *Bell* v. *Bell* (181 U. S. 175), *Andrews* v. *Andrews* (188 U. S. 14), *German Savings Society* v. *Dormitzer* (192 U. S. 125), *Lefferts* v. *Lefferts* (263 N. Y. 131) and in other carefully considered cases. The four dissenting justices in *Haddock* v. *Had-*

*dock* (201 U. S. 562, 608, *supra*) were in accord with the majority upon this point. They said: " Doubtless the jurisdiction of the court granting the divorce may be inquired into, and if it appear that the plaintiff had not acquired a *bona fide* domicil in that State at the time of instituting proceedings, the decree is open to a collateral attack, *Bell* v. *Bell*, 181 U. S. 175 ". There would be no occasion to regard the point as unsettled, even after *Williams* v. *North Carolina,* were it not for certain expressions in the opinions in that case which are not believed to have been necessary to the result.

Upon reflection, it seems clear that the sole object in *Williams* v. *North Carolina,* (317 U. S. 287, *supra*) was to bring about, as nearly as possible, the situation which would have existed if *Haddock* v. *Haddock* (*supra*) had been decided the other way. In that event the jurisdiction of the court granting the divorce could still be inquired into collaterally under *Bell* v. *Bell* (*supra*) as the four dissenting justices in the *Haddock* case agreed. Justice HOLMES, concurring in that statement, found no inconsistency between it and his own inability to reconcile the full faith and credit clause with " the notion of a judgment being valid and binding in the State where it is rendered, and yet depending for recognition to the same extent in other States of the Union upon the comity of those States." (Dissenting opinion of HOLMES, J., *Haddock* v. *Haddock,* 201 U. S. 562, 632.) If the default judgment of divorce which the defendant at bar obtained in Nevada on July 13, 1943, was void for want of jurisdiction, it was a nullity in Nevada as well as in New York, and could be attacked collaterally in theory of law in the Nevada courts as well as in those of this State. Whether a Nevada court would find absence of the jurisdictional fact of domicile and declare its nullity in practice is another matter. Courts do not always act alike in finding the facts. If the jurisdictional facts were to be held to have been present in a collateral attack instituted by this plaintiff in Nevada, such an adjudication would be binding in every State. But if, instead of moving in Nevada, plaintiff makes, as she does now, her collateral attack by this proceeding in New York and if it appears to the New York court that the Nevada decree was obtained without jurisdiction, the consistency of the law is unimpaired if this court does what the Nevada court also would be empowered to do if the question were raised there, and which it clearly ought to do if the same evidence were before it; and, the jurisdictional fact having been tried out here and found to be absent, in a proceeding in which both parties have appeared

and where the point is directly involved, the full faith and credit clause requires the Nevada courts to respect the New York adjudication of the nullity of the Nevada default decree. The determination of " the first state to pass upon the facts necessary to jurisdiction " (cf. dissenting opinion of JACK-SON, J., *Williams* v. *North Carolina*, 317 U. S. 287, 315, *supra*) *in an action or proceeding in which both parties are before the court* is conclusive against collateral attack anywhere — not, of course, against review by appeal or writ of error in a higher court. No judgment by default where the validity of the service of process upon the opposing party depends upon the court's having jurisdiction of the *res* can preclude the defendant from afterwards establishing that the *res* was absent — that the jurisdictional fact did not exist. No recognition by comity is involved in this point. If the jurisdictional fact. existed, the decree is binding in every State; otherwise it is binding nowhere, not even in the State which purported to render it.

One should hesitate before concluding that the intention in the *Williams* case (*supra*) was to give finality to the Nevada default adjudication of the jurisdictional facts, since such a ruling would extend beyond matrimonial litigation and violate a principle whose integrity is of the highest importance, not only in matrimonial cases but in commercial and other actions. That the judgments of courts of other States can be attacked collaterally for lack of jurisdiction of the person or of the subject matter has been regarded as the universal rule. (*Lefferts* v. *Lefferts*, 263 N. Y. 131, *supra; Bell* v. *Bell*, 181 U. S. 175, *supra; Andrews* v. *Andrews*, 188 U. S. 14, *supra; German Savings Society* v. *Dormitzer*, 192 U. S. 125, *supra; Riverside Mills* v. *Menefee*, 237 U. S. 189; *Pennoyer* v. *Neff*, 95 U. S. 714, *supra; Dull* v. *Blackman*, 169 U. S. 243; *Old Wayne Life Ass'n.* v. *McDonough*, 204 U. S. 8; *Dewey* v. *Des Moines*, 173 U. S. 193; *Simon* v. *Southern Railway*, 236 U. S. 115.)

The Court of Appeals, since the *Williams* decision, has made clear that it regards the judgment of another State in a divorce case as merely presumptive that the jurisdictional facts exist, and that such a presumption is rebuttable when the true facts appear upon collateral attack in this State. (*Matter of Holmes*, 291 N. Y. 261, *supra*.)

The full faith and credit clause of the Federal Constitution does not require a court in New York to pass upon the fact of domicile in the same manner in which it thinks a Nevada court might rule upon the question, any more than it would be required to adopt the same criterion of what constitutes

mental cruelty if the question were before it. The place where the action is brought is often of greater practical importance than the statutory grounds for divorce. A spouse unwilling to acquiesce in a dissolution of the marriage may be forced to give up on account of the remoteness of the forum, or of its habit of treating inconsequential evidence as bringing the case within whatever statutory grounds exist. Divorce by consent has been allowed by numerous legal systems at various times in the history of the world. (36 Columbia Law Review, p. 1132, note 76.) However one may be opposed to divorce by consent, it at least requires the concurrence of two persons, which is puritanical by comparison with divorce at the will of either spouse who has the money and the leisure for an excursion to a distant State where it would be impossible or futile for the other to follow. It has become more necessary than before *Haddock* v. *Haddock* (*supra*) was overruled for New York courts to be careful to protect residents of this State against divorces obtained in another State by parties whose domicile there has been sham. It is well known that in the usual case there is no real intention of remaining in the other State indefinitely, nor of going to it for any purpose except to get a divorce. Where the object of taking the trip is to overcome a meritorious defense which otherwise would be interposed, the gravest kind of injustice can result if our courts hesitate to declare the domicile in the other State to be as fictitious as it really is. Where there has been but a brief sojourn in another State, default decrees should be set aside upon slight additional evidence that there was no intention of remaining indefinitely. In this case, the evidence is more than sufficient for that purpose.

Defendant is a carpenter by trade. On April 16, 1943, he left Rochester, N. Y., for Nevada by train. His automobile remained in the yard of the house in Rochester where he had been living under the same roof with a divorcee and her two children, and where he has continued to live since getting his divorce. She had a chattel mortgage against the auto for $375 which she had loaned him, in addition to $75 which he received from her to pay his expenses to Nevada. She joined him in Nevada and on July 26, 1943, they came home to Rochester together via San Francisco after he had obtained his decree. Before leaving Rochester he had notified the local office of the State Commissioner of Motor Vehicles of his change of address, but was informed that it would be unnecessary to have any notation made thereof inasmuch as he would not be using his automobile while away. He resumed the use of his

automobile upon returning to Rochester under the same registration as before. His New York operator's license expired about a month after his return and he renewed it for three years giving the same residence address upon the application at Rochester, N. Y. He maintained his membership in the Rochester local of the carpenters' union during his absence and was enabled to work in Nevada through the courtesy of the union there, by reason of his membership in the local here. He is now working in Rochester at his regular trade. He left a few of his tools in Nevada to maintain appearances. He testified that if in the future any work came his way outside of Rochester, it would be likely to originate through a construction company with a national business having headquarters in San Francisco. He hoped that he might get a job with them at some time, which he testified might be in any State in the Union. There is no reason to believe that such a job, if it comes at all, will be in Nevada, which is not among the States having the largest amount of construction work to do in the country. Defendant stated that if he was hired outside of Rochester, of which there was no assurance, it would probably be in Illinois. For ten years before going to Nevada he worked for various carpenter contractors here, changing from one to another as is customary in the trade according to the amount and nature of work which they have to do. He has certified to Rochester as his residence in obtaining war ration books. He maintained a checking account in a branch office of the Lincoln-Alliance Bank and Trust Company, at Rochester, N. Y., during the time while he was getting his divorce. He did not notify any Rochester creditors to whom he owned small bills of a change in residence and made no transfer of membership in his Odd Fellows lodge in which he had long been active. He has not voted anywhere for several years.

Defendant testified that his return to Rochester was motivated by a desire to wind up his affairs here, such as the real estate which he owns with the plaintiff as tenant by the entirety, and other phases of his matrimonial situation. It does not appear, however, that any steps have been taken to sell the real property, or that he has done anything to wind up his matrimonial affairs except to allow this motion for sequestration to be made against him, and he has no clear plan to leave Rochester, let alone of returning to Nevada. He was in Nevada from April 20th to July 26th. At least six weeks of this time elapsed before the commencement of his action, so as to make a colorable compliance with the Nevada statute. His decree was entered July

13th. He waited a few days afterward to finish some carpentry that he had been doing on the courtesy union card, and to wait for his Rochester landlady who had not yet arrived.

A man's intention or lack of intention to remain indefinitely in a specified place may once have been locked in his own breast, with no external standards available to prove the contrary. It may have been possible, without fear of successful contradiction, to declare that one went to Nevada intending to stay forever, but did not like the climate after three months (six weeks, now) and decided to return to live as before. That is more difficult today. The State and Federal Governments and the societies and associations to which we belong keep too many tabs on us all. These are bound to leave telltale signs which help to conserve the benefits and minimize the inequities resulting from *Williams* v. *North Carolina* (317 U. S. 287, *supra*).

The motion for sequestration of defendant's property is granted with respect to alimony accruing before and after the defendant's Nevada decree of divorce.