" LILI KURSKI ", Petitioner, *v.* " JAN KURSKI ", Respondent.*

Domestic Relations Court of the City of New York, Family Court, Queens County, June 4, 1945.

* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details, in consonance with the spirit of section 52 of the New York City Domestic Relations Court Act.

*Ignatius M. Wilkinson, Corporation Counsel (Ida Casassa* of counsel), for petitioner and Department of Welfare of the City of New York.

*Morris Wolinsky* for respondent.

SICHER, J. Decision has been deferred pending the United States Supreme Court's disposition of the second appeal in *Williams* v. *North Carolina* (325 U. S. 226) now announced on May 21, 1945.

Upon the first appeal (317 U. S. 287) that court, overruling *Haddock* v. *Haddock* (201 U. S. 562), held that the full faith and credit clause of the Federal Constitution requires that " * * * a divorce granted by Nevada, on a finding that one spouse was domiciled in Nevada, must be respected in North Carolina, *where Nevada's finding of domicil was not questioned* though the other spouse had neither appeared nor been served

with process in Nevada and though recognition of such a divorce offended the policy of North Carolina." (FRANKFURTER, J., Williams v. North Carolina (325 U. S. 226, 227, second appeal, supra; italics supplied.) See "Standish" v. "Standish," 179 Misc. 564; Butler v. Butler, 179 Misc. 651.)

However, as above indicated, the prevailing opinion on the first appeal (Williams v. North Carolina, 317 U. S. 287, supra) expressly assumed that the spouses who procured Nevada divorce decrees had acquired bona fide domiciles in that State; the decision left wholly untouched the question of the right of the original domiciliary State to make its own independent determination of the bona fides of the alleged new domicile and to refuse recognition of a default decree procured by a spouse who, the original domiciliary forum determined, contrary to the finding of the granting State forum, had in truth not acquired a genuine new domicile. (See "Standish" v. "Standish," supra; Matter of Lindgren, 293 N. Y. 18, 24; McKee v. McKee, 179 Misc. 617, affd. 266 App. Div. 992, appeal dismissed, 293 N. Y. 758; Matter of Bingham, 265 App. Div. 463, 465; Shuart v. Shuart, 183 Misc. 270; Solotoff v. Solotoff, 269 App. Div. 677; cf. Matter of Holmes, 291 N. Y. 261, 268.)

Accordingly, in numerous New York opinions subsequent to the December 21, 1942, disposition of the first Williams v. North Carolina appeal (supra) decision turned on whether the particular facts established to the satisfaction of the New York court a bona fide new domicile in the granting State. And a flood of such opinions manifested an aggregate marked purpose to limit the scope of Williams v. North Carolina (supra) and to repudiate sister State, constructive-service, default-divorce decrees on the ground that the purported domicile in the granting forum State was actually a sham and a fraud. (See, for example, McCarthy v. McCarthy, 179 Misc. 623, affd. 268 App. Div. 1070; Reese v. Reese, 179 Misc. 665, affd. 268 App. Div. 993; Beitch v. Beitch, 266 App. Div. 868, affg. 43 N. Y. S. 2d 391; Ammermuller v. Ammermuller, 181 Misc. 98; Jolby v. Jolby, 181 Misc. 263; Stevralia v. Stevralia, 182 Misc. 1050; Engelman v. Engelman, 52 N. Y. S. 2d 221.)

In the matter at bar considerable evidence was therefore taken on the principal issue whether respondent " Jan Kurski ", when he instituted the divorce action in Florida, had then already abandoned his New York domicile and acquired a superseding domicile in Florida. And because the second Williams v. North Carolina appeal (supra) had been recently argued at Washington, today's decision has awaited announcement and

analysis of the United States Supreme Court's determination of such appeal, on which a controlling question, by-passed on the first appeal, was squarely raised and decided, as appears from the following further sentences from Justice FRANK-FURTER's opinion (*supra*, p. 227): " The record then before us did not present the question whether North Carolina had the power ' to refuse full faith and credit to Nevada divorce decrees because, *contrary to the findings of the Nevada court,* North Carolina finds that no bona fide domicil was acquired in Nevada.' *Williams* v. *North Carolina, supra,* 317 U. S. p. 302). *This is the precise issue which has emerged after retrial* of the cause following our reversal. * * * When this case was first here, North Carolina did not challenge the finding of the Nevada court that petitioners had acquired domicils in Nevada. For her challenge of the Nevada decrees, North Carolina rested on *Haddock* v. *Haddock,* 201 U. S. 562. Upon retrial, however, the existence of domicil in Nevada became the decisive issue." (Italics supplied.)

A two-thirds majority of the Justices (BLACK, DOUGLAS and RUTLEDGE dissenting) have now answered that question by holding squarely that: " A judgment in one State is conclusive upon the merits in every other State, but only if the court of the first State had power to pass on the merits — had jurisdiction, that is, to render the judgment. * * * In short, the decree of divorce is a conclusive adjudication of everything except the jurisdictional facts upon which it is. founded, and domicil is a jurisdictional fact. To permit the necessary finding of domicil by one State to foreclose all States in the protection of their social institutions would be intolerable. * * * North Carolina was entitled to find, as she did, that they did not acquire domicils in Nevada and that the Nevada court was therefore without power to liberate the petitioners from amenability to the laws of North Carolina governing domestic relations." (FRANKFURTER, J., 325 U. S. 226, 229, *supra*.)

Justice MURPHY also stated in a concurring opinion, joined in by Chief Justice STONE and Justice JACKSON (*supra*, p. 239, 242): " But if Nevada's divorce decrees are to be accorded full faith and credit in the courts of her sister States it is essential that Nevada have proper jurisdiction over the divorce proceedings. This means that at least one of the parties to each ex parte proceeding must have a bona fide domicil within

Nevada for whatever length of time Nevada may prescribe.
\* \* \* No justifiable purpose is served by imparting constitutional sanctity to the efforts of petitioners to establish a false and fictitious domicil in Nevada. Such a result would only tend to promote wholesale disregard of North Carolina's divorce laws by its citizens, thus putting an end to ' the existence of all efficacious power on the subject of divorce.' ' "

Thus, by unequivocal fiat of the United States Supreme Court, in every case involving the extraterritorial validity of an ex parte divorce decree the issue of jurisdiction is excepted from the general rule that " \* \* \* the full faith and credit clause of the Constitution precludes any inquiry into the merits of the cause of action, the logic or consistency of the decision, or the validity of the legal principles on which the judgment is based." (*Milliken* v. *Meyer,* 311 U. S. 457, 462; *Fauntleroy* v. *Lum,* 210 U. S. 230.)

Thereby that court has doubtless disappointed the advocates of a simplifying and stabilizing program, editorially phrased thus : " Granting that domicil within the state in which the divorce decree is rendered should not be dispensed with as a jurisdictional element, it may be advisable to except divorce cases from the general rule that jurisdictional facts are always subject to inquiry by the court in which recognition is sought of a foreign judgment, and to make binding upon the court in which the validity of the foreign decree is questioned, the findings of jurisdictional facts as to the domicil by the foreign court rendering the decree, even though such findings are not upon an actually contested hearing." (Note, 143 A. L. R. 1294, 1297–1298.)

Nor has the United States Supreme Court undertaken to set " \* \* \* the minimum standards of domicile in the divorce State sufficient to warrant application of the full faith and credit clause of the Constitution ". (SHIENTAG, J., *Meyers* v. *Meyers,* 179 Misc. 680, 681.) No guiding rule has been promulgated; the second forum must still seek to adjudicate the factual issue of domicile only in the light of general principles of the law of domicile (summarized and applied in *Reese* v. *Reese,* 179 Misc. 665, 668, 669, *supra,* affd. 268 App. Div. 993).

Indeed, instead of narrowing and standardizing the law determinative of the extraterritorial validity of divorce decrees, the reasoning and some of the language in *Williams* v. *North Carolina (supra)* second appeal — such as FRANKFURTER, J.'s observation that " The State of domiciliary origin should not

be bound by an unfounded, *even if not collusive,* recital in the record of a court of another State " (325 U. S. 226, *supra;* italics supplied) — are likely to open questions, theretofore deemed closed, as to the conclusiveness of consensual decrees entered on arranged notices of appearance but based on domicile not really litigated and in actual fact pretended and sham. For example, the following February 6, 1945, anticipatory comment of HAGARTY, J.: " Authority in this State such as *Kinnier* v. *Kinnier,* (45 N. Y. 535), *Tiedemann* v. *Tiedemann* (172 App. Div. 819, affd. 255 N. Y. 709, appeal dismissed 251 U. S. 536), and *Glaser* v. *Glaser* (276 N. Y. 296) proceeded under the concept, now shown to be mistaken (*Williams* v. *North Carolina,* 317 U. S. 287; see *Matter of Holmes,* 291 N. Y. 261, 267, 271), that acquirement of jurisdiction of the person by the court of a granting State was the dominant jurisdictional element in matrimonial actions. In the light of the fact that jurisdiction of the subject matter may now be scrutinized (*Matter of Bingham,* 265 App. Div. 463, leave to appeal denied 290 N. Y. 929), *even consent of a nonresident defendant will not necessarily serve to preclude inquiry into the status of a party as a domiciliary of the granting State.* (*Matter of Lindgren,* 293 N. Y. 18)." (*Solotoff* v. *Solotoff,* 269 App. Div. 677, 678.) (Italics supplied.)

But whether or not the *Williams* v. *North Carolina* (*supra*), second appeal, decision will generate new ' uncertainties, it should indisputably lay at rest all doubt as to the constitutional validity of the settled New York practice of rejecting " * * * a sister State default decree of divorce against a New York State domiciliary in any case where it is apparent that the tourist plaintiff cocked one eye askance at the examining justice while solemnly swearing intention to remain permanently in the divorce forum State and with the other eye anxiously watched the courtroom clock in nervous concern about catching the afternoon train 'back home.' " (" *Standish* " v. " *Standish,*" 179 Misc. 564, 570, *supra.*)

Most of the New York decisions reported since December 21, 1942, (first *Williams* v. *North Carolina* decision, *supra*) present factual situations in which was crystal clear the spuriousness of the purported granting State domicile of a spouse returning to New York with indexterous haste after procurement of the divorce decree. The facts in the matter at bar are not so flagrant nor quite free from doubt. But upon the whole record the court now finds that respondent " Jan Kurski " has not overcome the

presumption of continuance of his New York domicile and that the *pro confesso* Florida divorce decree he invokes lacks the jurisdictional prerequisite of an actual and bona fide Florida domicile.

No useful purpose would be served by a detailed narrative of the voluminous oral and documentary evidence. Suffice it to recite only a few salient facts and inferences and to state that *all* the facts (including demeanor) have been earnestly considered in arriving at today's decision.

The parties were duly married on July 22, 1924, at a Roman Catholic Church in New York City. Petitioner had recently become a widow and respondent a widower, and each was the parent of children by the deceased first spouse. No issue has been born of the second union. Conflict among those two sets of children (all now adults) and tensions deriving from the parties' common ownership of unprofitable realty culminated in a December, 1936, break. Thereupon petitioner filed in the Supreme Court, Queens County, a complaint, and respondent counterclaimed, for a separation on the ground of cruel and inhuman treatment, but, after a trial, judgment was entered on June 14, 1937, dismissing both complaint and counterclaim.

On July 19, 1937, a support proceeding in this court, which had been " Reserved Generally " on June 6, 1936, was dismissed by Justice O'BRIEN as prematurely reopened. But a new petition was accepted on October 6, 1937, Justice DUNHAM entering, on October 20, 1937, an order in the weekly sum of $4 on the ground that petitioner was likely to become a public charge and a showing that the realty was unproductive and respondent's only income earnings of $22 to $25 per week as handyman in a local cemetery.

On December 2, 1938, Justice O'BRIEN modified that order to $5, on the basis of an increase of respondent's net earnings to an average of $35 per week.

Such order has since been continually in force.

Petitioner's July 24, 1944, application for a further increase was opposed by respondent's cross application for vacatur on the plea that the Circuit Court of the Thirteenth Judicial Circuit of the State of Florida, Hillsborough County, had granted to him on May 19, 1944, a final decree of absolute divorce from petitioner on concededly due service by publication and mailing under the " 1941 Constructive Service Law of Florida " (Florida Statutes, ch. 48) and petitioner's default in appearance.

A duly introduced exemplified copy of that decree constituted presumptive evidence of the existence of the jurisdictional facts

entitling it to full faith and credit. (*Matter of Holmes,* 291 N. Y. 261, 273, *supra; Maloney* v. *Maloney,* 51 N. Y. S. 2d 4; *Williams* v. *North Carolina,* second appeal, *supra; Esenwein* v. *Esenwein,* 325 U. S. 279.)

But that presumption was overcome by the contents of the special master's report underlying such decree and various other facts shown on the hearings in this court, such as: (1) respondent came to Florida for the first time on November 27, 1943, after having resided in New York City more than forty years continuously since his immigration there from Lithuania; (2) in New York City he married and lived with two wives and his three children were born and reared there; (3) for upwards of seven years after the separation from petitioner he remained in the marital abode at Bayside, Long Island, and left all his furniture there when he went to Florida; (4) he started a Florida action for divorce on March 25, 1944, i.e., immediately on expiry of the required minimum of ninety days residence; (5) he asked and procured a Florida divorce on allegations of cruel and inhuman treatment which had been rejected by the Supreme Court, Queens County, as insufficient even for a judgment of separation in New York; (6) he testified before the special master that he decided to make Florida his permanent place of residence and his home one week after arriving there in November, 1943; (7) already on May 25, 1944, only six days after entry of the Florida divorce decree, he was again back in New York City and at his former job in a Long Island cemetery, having meanwhile continued membership in a New York City union; and (8) he has continued his ownership of and efforts to salvage three parcels of New York City realty (two of them as tenant in common with petitioner).

True, in Florida he lodged not in a hotel or tourist camp but in the home of a married daughter; his age and physical condition make plausible the possibility of his preferring to live and work in the milder Florida climate; and there was testimony explaining his return to New York City so soon after procurement of the Florida decree as a temporary arrangement to enable him to do repairs on his New York City realty for which his daughter here had been unable to engage workmen.

However, on balance, the countervailing factors above enumerated bring the case within the sound principle that " Where there has been but a brief sojourn in another State, default decrees should be set aside upon slight additional evidence that

there was no intention of remaining indefinitely " (*Forster* v. *Forster*, 182 Misc. 382, 387), and justify the conclusion that respondent has not sustained the onus of *clear* and *convincing* proof of a change of domicile from New York to Florida already at the date of filing the divorce complaint. (*Matter of Newcomb*, 192 N. Y. 238, 251; *Reese* v. *Reese, supra; Shuart* v. *Shuart, supra.*)

Further basis for such conclusion are the nature and objectives of support orders of this court of limited jurisdiction, especially one which indemnifies the community, in whole or in part, against the cost of a wife's maintenance. That consideration is reflected in the unanimity of the United States Supreme Court's decision in *Esenwein* v. *Esenwein* (325 U. S. 279, *supra*), handed down on May 21, 1945, simultaneously with the *Williams* v. *North Carolina,* second appeal, decision (*supra*). In *Esenwein* v. *Esenwein* (*supra*) a Nevada constructive service default decree had been asserted in bar to a support order of a Pennsylvania Court comparable to Domestic Relations Court of the City of New York. All nine Supreme Court Justices concurred in affirming Pennsylvania's rejection of the Nevada decree as without bona fide domicile foundation. RUTLEDGE, J., who had vigorously dissented from the majority holding in *Williams* v. *North Carolina,* second appeal (*supra*), filed an explanatory opinion in *Esenwein* v. *Esenwein* (*supra,* p. 283) to the effect that " the jurisdictional foundation for a decree in one state capable of foreclosing an action for maintenance or support in another may be different from that required to alter marital status with extraterritorial effect." He and Justice BLACK also joined in a concurring opinion of Justice DOUGLAS (who likewise had dissented in *Williams* v. *North Carolina,* second appeal, *supra*), in which Justice DOUGLAS stated (*supra,* p. 281): " I think it is important to keep in mind a basic difference between the problem of marital capacity and the problem of support. * * * Quite different considerations would have been presented if North Carolina had merely sought to compel the husband to support his deserted wife and children, whether the Nevada decree had made no provision for the support of the former wife and children or had provided an amount deemed insufficient by North Carolina. In other words, it is not apparent that the spouse who obtained a decree can defeat an action for maintenance or support in another State by showing that he was domiciled

in the State which awarded him the divorce decree. * * * The State where the deserted wife is domiciled has a deep concern in the welfare of the family deserted by the head of the household * * *."

By virtue of *Loomis* v. *Loomis* (288 N. Y. 222) today's determination that the May 19, 1944, ex parte Florida decree of divorce is ineffectual to end this court's jurisdiction to order support for petitioner will not be *res judicata* in any matrimonial or declaratory judgment action which either party may institute in the Supreme Court of the State of New York. The availability of that forum for such an authoritative determination of the parties' marital status is further reason for holding that the aforesaid Florida decree is not such "judgment of any other court of competent jurisdiction, when valid in the state of New York", as is contemplated in subdivision 1 of section 137 of New York City Domestic Relations Court Act. And that view is fortified by the public policy expressed in chapter 559 of the Laws of 1945, which adds on September 1, 1945, the following new section (1169-a) to the Civil Practice Act: " *Counsel fees and expenses in action to declare validity or nullity of foreign judgment of divorce.* In an action to declare the validity or nullity of a judgment of divorce rendered against the wife who was defendant in any action outside the state of New York and did not appear therein where the wife asserts the nullity of such foreign judgment, the court, in its discretion, during the pendency thereof, from time to time may make or modify an order or orders requiring the husband to pay any sum or sums of money necessary to enable the wife, to carry on or defend the action." (Cf. *Kraunz* v. *Kraunz*, 51 N. Y. S. 2d 433.)

The court has also concluded that the evidence does not warrant any present change in the amount of the December 2, 1938, order.

For the foregoing reasons petitioner's application and respondent's cross application are, each, hereby in all respects denied, and said order hereby continued.

Notice shall be given to the parties pursuant to the subjoined direction.