"DORA BENEDICT", Petitioner, *v.* "MAURICE BENEDICT", Respondent.*

Domestic Relations Court of the City of New York, Family Court, Bronx County, August 5, 1952.

* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details in consonance with the spirit of section 52 of the New York City Domestic Relations Court Act (L. 1933, ch. 482).

*Edwin R. Wolff* for petitioner.

*Daniel D. Bier* for respondent.

SICHER, J. The following facts are undisputed: The parties were duly married at New York City on August 12, 1934, and became the parents of two children, " Cynthia " (born June 8, 1936) and " Daniel " (born December 11, 1940); they lived as a family unit in New York City continuously until at least September, 1948, and during the latter years of that period in the Bronx County apartment which petitioner and the two children still occupy; in any event respondent is chargeable with the support of those children according to his means and station in life; and such duty of support may be admeasured and enforced by this court regardless of the validity or invalidity of a constructive service default decree of divorce which respondent caused to be entered in his favor against petitioner on January 10, 1951, in the Second Judicial District Court of the State of Nevada, Washoe County.

Because those children are residing in New York City and respondent is now domiciled, or in any event has been " found " and served personally, in New York City and has appeared generally by attorney in this proceeding, concededly this court has the requisite jurisdiction to enter an order for their support (N. Y. City Dom. Rel. Ct. Act, § 103, subd. 1; *Helman* v. *Helman,* 190 Misc. 991; *Schacht* v. *Schacht,* 58 N. Y. S. 2d 54, 187 Misc. 461; cf. *Langerman* v. *Langerman,* 303 N. Y. 465). On that phase the only issue for determination is the " fair and reasonable sum " which respondent may be required to contribute (N. Y. City Dom. Rel. Ct. Act, § 92, subds. [1]–[4]; § 101, subd. 1). However, despite well-established controlling legal principles, that controverted issue as to amount is complicated by emotional factors unfortunately not uncommon in this kind

of widespread difficulty. " A very real problem which affects support payments is that of remarriage by the man and establishment of a second family. The father then becomes so involved financially that he takes care of the family making immediate demands and neglects his prior responsibilities." (Quoted from the Annual Report for 1951, Cuyahoga County Juvenile Court, Cleveland, Ohio, p. 17.)

And that aspect becomes still further complicated when, as in the case at bar, the first wife questions the legality of the husband's remarriage and asserts that his " second wife " is as a matter of law his paramour and, as such, without any legal right to support.

According to a June 10, 1952, Probation Bureau Chronological Record entry, at the first intake interview with petitioner she indicated an intention to apply for support for the children only. However, the petition as filed and subsequent steps call for inclusion also of the mother, personally, on the asserted ground that she alone is still respondent's legal wife.

It was proved that both petitioner and respondent are professional hairdressers and had worked together until the last three or four years before their separation; and that during such three or four years petitioner had remained at home merely as housewife but in May, 1950, resumed gainful occupation, her earnings as a beauty parlor receptionist being now a gross of $60 a week and a net of $54.30.

Beginning about September, 1948, respondent started to remain at X Town, New Jersey (except for week ends) and conducted there a certain manufacturing or sales business, which, however, did not prosper and was liquidated in the autumn of 1950.

In July, 1950, he went to Nevada to procure a divorce in that State of easy requirements, and immediately after expiration of the minimum statutory period instituted, on October 23, 1950, in the Second Judicial District of the State of Nevada, Washoe County, an action for divorce " upon the ground of extreme cruelty, entirely mental in nature." However, he interrupted his Nevada sojourn to return to New Jersey in November, 1950, in connection with the liquidation of the afore-mentioned business but went back to Nevada to procure entry, on January 10, 1951, of a default judgment of divorce in his favor against petitioner; that judgment expressly reciting that the defendant had not appeared and had been served with the summons only in New York City pursuant to an order of publication but that

she should have the custody of the two children and defendant pay to her for their support the sum of $25 per week.

Such award figure is not binding on the children, who are entitled to support in whatever amount this court may adjudge from time to time to be a " fair and reasonable sum " (see " Stone v. Stone ", 44 N. Y. S. 2d 558; Schacht v. Schacht, 58 N. Y. S. 2d 54, 187 Misc. 461, supra; Helman v. Helman, 190 Misc. 991, supra; Matter of Karchmer v. Kane, 275 App. Div. 715; Scrima v. Scrima, 265 App. Div. 483; Mallina v. Mallina, 167 Misc. 343, and Langerman v. Langerman, 303 N. Y. 465, supra). But the $25 figure, having been suggested by respondent, constitutes at least an admission by him of his minimum duty of support (cf. " Johnston " v. " Johnston ", 177 Misc. 618).

While in the State of New Jersey during November, 1950, respondent was personally served there with process of the Superior Court of New Jersey, Chancery Division, Somerset County, instituting an action in which the plaintiff (petitioner herein) prayed for a judgment that the defendant (respondent herein) be ordered " to desist and refrain from proceeding further in any respect with said action instituted by him against the plaintiff in said Nevada Court and from entering and taking any order, judgment or decree therein, excepting an order, judgment or decree dismissing said suit ".

In that New Jersey action a judgment in favor of the plaintiff (petitioner herein) was entered against the defendant (respondent herein) on April 4, 1951. It recites that the defendant was personally served within the State of New Jersey and appeared there on January 10, 1951, and that there were hearings on January 15, 1951, and on February 19, 1951; and it contains the following further provisions:

And the Court having read and considered the pleadings and having taken the proofs in open Court in this cause, from all of which it now appears to the satisfaction of the Court that the plaintiff and defendant were lawfully married on August 2, 1934, as alleged in said Complaint, and that the plaintiff and defendant resided in the City of New York, State of New York, until September 1948, when the defendant became a resident of * * * Somerset County, New Jersey and has continued to be a resident thereof since that time;

And it further appearing that the defendant herein was granted a Decree of Absolute Divorce by the Second Judicial District Court of the State of Nevada, in and for the County of Washoe, on the 10th day of January 1951, upon the petition of the defendant herein, alleging extreme cruelty, entirely mental in nature, and bona fide legal residence in said State of Nevada;

And it further appearing that the plaintiff herein was not served with process in said Nevada suit; that plaintiff did not participate therein in any way and

that there was no litigation in said suit on the question of defendant's domicile in the State of New Jersey;

And it further appearing that said decree of divorce was procured by fraud and imposition of defendant herein upon the Second Judicial District of the State of Nevada, in and for the County of Washoe, in that jurisdiction to determine said cause in the State of Nevada was founded and predicated upon *bona fide* legal residence of defendant therein when *as a fact from the evidence adduced herein defendant never did establish a bona fide legal residence in the State of Nevada;*

And the Court being satisfied in the premises that the demand of plaintiff should be granted, in that said decree of divorce of the Second Judicial District Court of the State of Nevada, in and for the County of Washoe, was procured, and was intended to be procured, by the fraud and imposition of the defendant here upon said Second Judicial District Court of the State of Nevada, in and for the County of Washoe;

It is, on this fourth day of April 1951, ORDERED and ADJUDGED by the Superior Court of New Jersey, Chancery Division, that the said decree of absolute divorce granted by the Second Judicial District Court of the State of Nevada, in and for the County of Washoe, dated the Tenth day of January 1951, be and the same is hereby declared to be null, void and of no force or effect *in this State.* (Emphasis supplied.)

An order or judgment merely restraining a spouse from prosecuting an action for divorce in a sister-State court might not restrain that court but would operate solely on the defendant (see *McKendry* v. *McKendry,* 280 App. Div. 440). However, it should be observed, although the aforesaid New Jersey action was initially a suit for an injunction against respondent's proceeding with a then pending Nevada divorce action, it developed, after appearance by the defendant husband and supplemental pleadings, into a controversy over, and an adjudication of, the invalidity of the Nevada judgment which had been entered by him during and in disregard of such New Jersey suit. Those particular facts therefore differentiate the case at bar from *Sivakoff* v. *Sivakoff* (280 App. Div. 106), a constructive service default action.

Petitioner asserts that the above-quoted finding of the Superior Court of New Jersey, Chancery Division, Somerset County — concededly a court of general jurisdiction — is entitled to full faith and credit in the instant proceeding and constitutes a conclusive adjudication, binding on the parties and this court, that the aforesaid Nevada decree of divorce lacks the jurisdictional fundament of a bona fide Nevada domicile and that it is therefore not the kind of sister-State judgment contemplated by subdivision 1 of section 137 of the New York City Domestic Relations Court Act as precluding a divorced wife from seeking in this court a support order for herself personally.

Respondent, in turn, argues that the New Jersey judgment by its terms has no extraterritorial effect; that it is merely a futile injunction against a previously entered Nevada divorce decree; and that it lacks subject-matter jurisdiction because predicated on an assumed New Jersey domicile of respondent, which, it is now urged, did not then exist. And respondent further contends, in disregard of the clear and express language of the New Jersey judgment, that " It must be borne in mind that the New Jersey action was never an action inquiring into the jurisdiction of the Nevada Court."

On the contrary, that was the objective of the New Jersey action and judgment; and respondent's specious arguments overlook established principles embodied in Restatement of the Law, Conflict of Laws:

" § 96. *Enjoining Acts in another State.* A state can exercise through its Courts jurisdiction to forbid a party, who is subject to its jurisdiction, to do an act in another state.

" § 97. \* \* \* A state can exercise through its courts jurisdiction to order or to forbid the doing of an act within the state, although to carry out the decision may involve doing an act or affecting a thing in another state.

" § 451. *Res Judicata and Jurisdictional Facts.* A party appearing and participating in proceedings in a court of any state will be precluded from questioning the jurisdiction of the court over his person in any subsequent proceeding in that state, or in any other state if the court in which he appeared purported to render judgment against him.

" *Caveat:* The Institute expresses no opinion whether and how far a party appearing and participating in the proceeding in a court of any state is precluded from subsequently questioning the jurisdiction of the court over the subject matter of the action in the courts of that state or any other state if the Court in which he appeared purported to render a judgment against him. \* \* \* The principles of former adjudication described in § 450, not only apply to the effect of a judgment on legal obligations but apply to all findings of fact upon which the judgment was based except in so far as the facts found are necessary to the jurisdiction of the court rendering the judgment. \* \* \* If a party enters an appearance in court and formally engages in prosecuting or defending a cause of action, such a party is foreclosed from raising the question of the jurisdiction of the court over his person in any subsequent proceeding." (Pp. 540–541.)

The above-quoted caveat has been rendered nugatory by several subsequent decisions of the United States Supreme Court of the genre of *Sherrer* v. *Sherrer* (334 U. S. 343). True, if the New Jersey judgment procured by petitioner had been a default judgment based on constructive service only, like the Nevada divorce decree procured by respondent, that New Jersey judgment also might be now open to the objection that it lacked subject-matter jurisdiction. But as respondent was served personally in New Jersey, appeared by attorney and litigated, or could have litigated, the issue of the spuriousness of respondent's purported Nevada domicile, that issue is no longer open to question.

Moreover, assuming *arguendo* that the New Jersey court's finding as to the *mala fides* of the purported Nevada domicile of respondent underlying the Nevada divorce decree is not entitled to full faith and credit in this proceeding, nevertheless the evidence developed at the extended July 14, 1952, hearing before me would constrain the same conclusion as that incorporated in the New Jersey judgment.

A duly introduced copy of that Nevada divorce decree constituted presumptive evidence of the jurisdictional facts entitling it to full faith and credit in this court (*Matter of Holmes,* 291 N. Y. 261, 273; *Matter of Franklin* v. *Franklin,* 295 N. Y. 431; *Maloney* v. *Maloney,* 51 N. Y. S. 2d 4; *Esenwein* v. *Commonwealth,* 325 U. S. 279). But that presumption was overcome by evidence developed at the July 14, 1952, hearing before me within the right, preserved by *Williams* v. *North Carolina* (317 U. S. 287, 325 U. S. 226) of any sister-State court in which a constructive service divorce decree is pleaded to make its independent determination of the *bona fides* of the alleged new domicile and to refuse to recognize a default decree procured by a spouse who, the court in which such decree is pleaded determines, contrary to the finding of the granting State forum, had in truth not acquired a genuine new domicile.

For, the record as a whole falls within the ambit of the sound principle that "Where there has been but a brief sojourn in another State, default decrees should be set aside upon slight additional evidence that there was no intention of remaining indefinitely" (*Forster* v. *Forster,* 182 Misc. 382, 387), and it constrains the conclusion that, despite respondent's glib, incredible testimony of original intention to remain permanently in Nevada, the evidence as a whole falls short of the requisite *clear* and *convincing* proof of a change of domicile to Nevada.

(See *Reese* v. *Reese,* 179 Misc. 665, affd. 268 App. Div. 993; *Matter of Newcomb,* 192 N. Y. 238, 251; *Rose* v. *Rose,* 277 App. Div. 1137; " *Kurski* " v. " *Kurski* ", 185 Misc. 97; and *Matter of Veltri,* 202 Misc. 401.)

The parties were married in New York City in August, 1934, and lived together there continuously until at least September, 1948; respondent voted in New York City, and never elsewhere; he went to Nevada in July, 1950, for the first time, after his fancy had already turned to the woman whom he then " married " on April 23, 1951, following a typical Nevada divorce mill constructive service default decree; he remained in Nevada only about two months after procuring such decree, his entire Nevada sojourn running only from July, 1950, to March, 1951, less an interval in the autumn of 1950, when he left Nevada to transact business in New Jersey; while in Nevada he did not ply his usual, now again present, occupation as hairdresser but had only a casual job as a general worker in a private club; in March, 1951, he resumed his former occupation of hairdressing, entering the employ of a New York concern having one of its many branches in Arizona, where respondent worked from March, 1951, until shortly before returning to New York City, via Cleveland, Ohio, to continue employment as hairdresser for the same organization in its concession at a New York City department store.

For the foregoing reasons it is now held that respondent's claimed acquisition of a bona fide Nevada domicile has been disproved by a fair preponderance of the evidence, and that the January 10, 1951, Nevada constructive service default decree of divorce therefore does not constitute a " judgment of any other court of competent jurisdiction, when valid in the state of New York " within the meaning and scope of subdivision 1 of section 137 of the New York City Domestic Relations Court Act.

However, by virtue of *Loomis* v. *Loomis* (288 N. Y. 222) such ruling would not be *res judicata* in any declaratory judgment or matrimonial action which either party may, and should, institute in the Supreme Court of the State of New York (see " *Morton* " v. " *Morton* ", 199 Misc. 547, 551–552). For, until an authoritative adjudication, as by the Supreme Court of the State of New York, there may still be shrouded in doubt petitioner's freedom to remarry when and if the inclination and opportunity occurs, the legitimacy of the child expected to be shortly born to respondent and his " second wife ", and the nature and extent of respondent's various legal support obligations.

Meanwhile, his prior support obligations to petitioner and her two children must be admeasured in the instant proceeding. And that responsibility involves difficulties stemming from respondent's incapacity to maintain two families adequately; this court is constantly making insufficient orders because it must take into account not only the needs of the dependents but also the inability of the person chargeable with support to meet a fuller order (see *Domb* v. *Domb*, 176 Misc. 409, 410–411, PANKEN, J.). Moreover, as above indicated, the financial problems commonly arising after remarriage following an effective divorce are aggravated by the evil of the nugatory Nevada default divorce decree by which respondent, in an abortive attempt to throw off legal and moral obligations which chafed him, has created additional difficulties for himself and hardships for all the victims of his selfish conduct.

In arriving at today's order no allowance may be made for respondent's " second wife " personally; in view of the adjudged invalidity of the Nevada divorce decree she has no legal claim on respondent. And even if there had been a lawful remarriage, she knew of respondent's prior support obligations, at least to the two children, and assumed that hazard. However, her pregnancy is a factor which should not be wholly disregarded, inasmuch as respondent does have legal as well as moral obligations for the safe delivery of the expected child and for its support after birth; and there is logical force in the view that the court should look at the entire situation realistically. (Cf. " *Johnston* " v. " *Johnston* ", 177 Misc. 618, and cases cited, pp. 623–625.)

Although respondent has higher potential earning capacity, his current income, and the assumed base of today's order, is an average of $75 a week net. His present job started as recently as June 1, 1952, at a salary of $60 a week (less deductions of ninety cents for Federal Social Security and $1.90 for Federal withholding taxes), in addition to tips which should soon bring the net total up to at least $75 a week. He testified that during the initial period he averaged only twenty-two jobs a week but that he can do a much larger number, since each job takes only about thirty minutes, and that he can gradually build up a clientele but, he estimates, it will take from one year to one and one-half years to establish a following to the point where his salary and tips would aggregate $100 a week net.

Today's order is therefore based on $75 a week net, subject to an application for an increase after a period long enough to be fairly indicative and subject also to other modification,

upwards or downwards, from time to time, pursuant to Family Court Rule XVI according to the customary practice of this court.

Petitioner's earnings are not relevant to respondent's obligation to his children. For, the primary duty of support of minor offspring is cast on the father, regardless of any resources of the mother; and it is a duty measured by the child's needs in relation to the father's ability to provide and station in life and not merely at the low subsistence level of public charge budgets (see *Schacht* v. *Schacht,* 187 Misc. 461, *supra,* and cases cited; cf. *Young* v. *Valentine,* 177 N. Y. 347, 352).

However, although petitioner's energy and self-respect in resuming gainful occupation to better her and the children's scale of living does not exempt respondent from his support duty to her (see " *Walton* " v. " *Walton* ", 180 Misc. 746, 747–748), nevertheless petitioner's earnings do constitute one of the " circumstances of the respective parties " to be weighed under subdivision (1) of section 92 of the New York City Domestic Relations Court Act in arriving at the provision for the petitioner wife personally.

For the foregoing reasons the court finds that respondent is chargeable with the support of the wife and the two children named in the petition according to respondent's means and on a separate maintenance basis; and he is therefore hereby ordered and directed to pay into this court for their support the sum of $30 a week, each and every week beginning with August 8, 1952, until further order of the court.

There are no temporary order arrears.

Petitioner's application for an undertaking is at this time denied, with leave to renew, however, in the event of respondent's default in compliance with today's order.

As to visitation: It is a self-evident commonplace that a broken home usually has adverse effects upon young children and that such harm is aggravated by attempts of the parents to use them as pawns in the marital conflict or in the competition for the children's esteem. So, no matter how deeply, and understandably, petitioner may resent respondent's " second wife ", insofar as concerns the children it is incumbent upon her to be mindful that " where love once was, let there be no hate." It is therefore earnestly urged that the parties minimize the children's emotional trauma by petitioner's vouchsafing to respondent full and free opportunity to develop their affection and respect, and that the parents make reasonable voluntary arrangements as to the times, places and other details of visitation. It

is my impression and hope that both parties, being intelligent, may be persuaded by this exhortation, especially since a July 22, 1952, letter from petitioner's counsel proposes what appears to be a fair and reasonable plan. If, nevertheless, the parties fail to agree upon and carry out a mutually satisfactory visitation plan, upon request of, either party any controversy concerning visitation may be scheduled for hearing before the Justice then presiding at the Bronx County Family Court or, preferably, there may be recourse to the Supreme Court, either in the suggested plenary matrimonial action or a habeas corpus proceeding. For, it is at least arguable that the Family Court lacks subject-matter jurisdiction to order visitation of a child of divorced parents. This statutory court of limited jurisdiction can exercise only such powers as have been expressly conferred upon it by the Legislature; and the only power covering visitation is contained in subdivision (7) of section 92 of the New York City Domestic Relations Court Act, reading:

'' (7) In case where a child is involved to make an ' order of protection,' in assistance or as a condition of an order for support, setting forth conditions of behavior to be observed for a specified time which shall be binding upon *husbands* or *wives,* or both, as circumstances may require, and which must be reasonable. Such orders may require *either spouse* (a) To stay away from the home or from the *other spouse* or children; (b) To permit the other to visit the children at stated periods; (c) To abstain from offensive conduct against the other or against the children; (d) To give proper attention to the care of the home; (e) *To refrain from acts of commission or omission that tend to make the home not a proper place for the other spouse* or the children.'' (Emphasis supplied.) (See '' Horner '' v. '' Horner '', 184 Misc. 989; affd. *sub nom. Matter of Hartstein* v. *Hartstein,* 269 App. Div. 770; see, also, *Kinsey* v. *Lawrence,* 100 N. Y. S. 2d 597, 606, 607.)

So, there might be an inconsistency between respondent's request for an order of protection and his contention that petitioner is no longer his spouse.

Notice of today's decision and order shall be given to the parties pursuant to the subjoined direction.