"STELLA WERNER", on Behalf of "ALBERT WERNER", Petitioner, v. "RALPH WERNER", Respondent.*

Domestic Relations Court of the City of New York, Family Court, New York County, December 11, 1953.

*Laurence B. Ashkin* for petitioner.

*Sol Douglas* for respondent.

SICHER, J. This proceeding is a sequel to a consensual Florida decree of divorce which was entered on February 17, 1948, in the Circuit Court of the 11th Judicial Circuit in and for Dade County, Florida, and which awarded to the mother custody of the only child of the marriage and $25 a week for that child's support.

Since respondent resides in the city of New York, the child was not a party to the Florida action, and the court which

---

* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details, in consonance with the spirit of section 52 of the Domestic Relations Court Act of the City of New York (L. 1933, ch. 482).

entered such decree has the power to modify it (Florida Statutes, Annotated, Vol. 5, ch. 65, § 65.15), this court has jurisdiction to entertain this proceeding (*Langerman* v. *Langerman,* 303 N. Y. 465 and 203 Misc. 230; see, also, *Matter of Pinto,* 203 Misc. 244).

It is undisputed that "Stella Werner" and "Ralph Werner" married each other on November 4, 1938, and became the parents of the one child who is the subject of the petition herein, namely, "Albert Werner" (born December 11, 1941); that on September 4, 1947 the parents entered into a separation agreement which was embodied in said final decree of divorce upon the father's appearance by attorney and filing an answer in the divorce action; that within a few days after the entry of the Florida decree the mother remarried; that her second marriage also eventuated in a Florida divorce decree (entered February 2, 1952), which granted her alimony of $50 a week for herself until there will have been paid to her at that rate some stated sum but that she had appealed for a fuller provision; that the respondent father also had remarried on June 1, 1949, and by his second wife became the father of a daughter ("Esther", born April 10, 1951).

The mother now asks in "Albert's" behalf $100 a week. But her testimony and demeanor created the distinct impression that she seeks in this proceeding, by indirection and without any legal right (N. Y. City Dom. Rel. Ct. Act, § 137, subd. 1), support for herself individually as well as the child, now that her second marriage venture has also failed.

The sole issue for determination is the fair and reasonable amount which respondent may at this time be required to pay for "Albert's" support.

Unfortunately, the briefs of both counsel are too unrealistic to be of material aid to the court. Each attorney overzealously presses the exaggerated contention of his respective client; the mother's counsel presenting obviously padded figures, and the father's counsel vainly attempting to justify his client's rigid, punitive attitude concerning his son in total disregard of the well-established law that in this State a visitation dispute does not excuse a father's violation of a court order for support of his child. (See Grossman on New York Law of Domestic Relations, § 162, and cases cited; also, the discussion in "*Almandares*" v. "*Almandares*", 186 Misc. 667.) "It is not the policy of the law to deprive children of their rights on account of the dissensions of their parents for

causes of which they are innocent and by proceedings to which they are not parties. The legal and natural duty of the father to support his children is not to be evaded by him * * * on the ground of any dissensions whatsoever with his wife. A natural father would not think of doing so, and an unnatural one should not be permitted to do so." (17 Am. Jur., Divorce & Separation, § 693, p. 529.) "While the decree of divorce dissolves the marital relations of the parties, it did not divorce the father from his child or dissolve his liabilities to it." (Carmody on New York Practice [2d ed.], § 194, p. 293, citing *Laumeier* v. *Laumeier*, 237 N. Y. 357.)

It is also pertinent that "the aftermath of divorce brings a variety of sensitive situations * * *. Probably the most frequent and familiar duels between the former partners to a marriage arise over two issues; money is one, and the exercise of the father's visitation privileges the other. * * * Time and events have come between the father and his children. He has lost the ease of daily contact. His feeling of guilt toward them may make him press too hard for a loving response from them, and any rebuff they offer is magnified out of its true proportion. The children too are ill at ease. His presence may be a threat to the new security they may have worked hard to build without him." ("Children of Divorce", by J. Louise Despert, M. D., 1953, p. 69.)

Of course, this court has neither the duty nor the power to enforce *any* provision of the Florida decree, whether concerning visitation or support; its jurisdiction is quite independent of that decree, and by virtue of *Langerman* v. *Langerman* (*supra*) it is exercisable regardless of what amount may have been fixed in the sister-state decree, even by stipulation, or whether the provisions of such decree are being obeyed or breached. The sole fundament of this Family Court's jurisdiction is, instead, the primary obligation of a father for support of his minor child, *measured by the child's changing needs in relation to the father's ability, from time to time, to provide and his station in life* (see "*Johnston*" v. "*Johnston*", 177 Misc. 618, 623; *Prindle* v. *Dearborn*, 161 Misc. 95, 99; and *Schacht* v. *Schacht*, 187 Misc. 461; cf. *Garlock* v. *Garlock*, 279 N. Y. 337, 340).

The net of the mass of decisions applying that principle and therefore a guide for today's disposition has been tersely summarized thus: "The legal duty of a parent to support his minor children is affected by many considerations. His

health, his means, his station in life, as well as similar considerations on the part of the child, have a bearing upon it. Although he is bound to furnish support while his legal obligation continues, if of sufficient ability, it is the duty of the parent only to do the best he can to support his child in the manner suitable to his station and circumstances. The tests of the parent's ability to furnish adequate support are ordinarily comparative rather than absolute. The relative size of the income or means of the parent and of the child must be considered, as well as the number of persons dependent on the father for support, and other items of expense or other demands to be met out of the father's means ''. (39 Am. Jur., Parents & Child, § 36, p. 636.)

The determination of the '' fair and reasonable sum '' which respondent may be required to contribute in this proceeding (N. Y. City Dom. Rel. Ct. Act, § 92, subds. [1]-[4]; § 101, subd. 1) is further complicated by emotional factors unfortunately not uncommon in this kind of widespread difficulty. '' A very real problem which affects support payments is that of remarriage by the man and establishment of a second family. The father then becomes so involved financially that he takes care of the family making immediate demands and neglects his prior responsibilities.'' (Annual Report for 1951, Cuyahoga County Juvenile Court, Cleveland, Ohio, p. 17.)

And that phase is here intensified by the failure of '' Albert's '' mother's second marriage. Unfortunately for him, this proceeding has revived the tensions which led to the original divorce and made him the victim of the resultant renewed hostility between the parents. Thus, although the separation agreement provisions incorporated in the Florida decree contemplated that the child might reside in Florida and become available for visitation in New York State only during the summer months, respondent attempts to justify his inexcusably stopping in June, 1953, even the $25 weekly payments on the asserted ground that '' Albert '' shows no respect or affection for him and that therefore he refuses to make any further payments for what he callously characterized as a '' dead horse ''.

As I have previously held, this court of limited jurisdiction has no power to order visitation of a child of divorced parents (see '' Benedict '' v. '' Benedict '', 203 Misc. 286, 295-296). But surely the mother should realize that in the long run '' Albert '' will be the loser if she drops an iron curtain between

him and his father. In self-respect the mother and father should have heeded this court's urging that they reach a reasonable agreement concerning visitation and "Albert's" maintenance; and each will now doubtless be dissatisfied with today's order, entered upon a voluminous record necessitated, on the one hand, by petitioner's unyielding demand for an excessive award and, on the other hand, by the father's stubborn refusal to recognize his legal and moral obligations toward the child of the broken marriage.

No useful purpose would be served, and the preparation of this memorandum further delayed, by a detailed narrative of the evidence. Suffice it to recite only certain salient facts and to state that in reaching today's decision there has been carefully considered *all* the evidence, including the demeanor of the parties.

The mother is intelligent, well-spoken, but highly emotional, and seemingly seeks for "Albert" a scale of living reflecting the maternal grandparents' means rather than the father's. But the fact that her demands are patently exaggerated is no ground for giving "Albert" less than the amount to which he is entitled upon the present record. (Cf. *Rabins* v. *Rabins,* 282 App. Div. 690.)

There are authorities to the effect that a father's remarriage should not affect adversely the support rights of the issue of his first marriage (cf. *Phillippi* v. *Phillippi,* 148 Fla. 393), and that any such children are in a sense first mortgagees of the father's earnings or other resources. However, the better view appears to be that the court should look at the *entire* situation as it exists, and predicate every support order on the theory that *all* parties entitled to support should receive awards in fair proportions in the light of the particular circumstances (cf. *Krause* v. *Krause,* 282 N. Y. 355). Moreover, respondent's remarriage was not in violation of the Florida decree, which contains no prohibition against remarriage, such as is usually included in a New York Supreme Court divorce judgment. Besides, it is a fair inference from the shortness of the interval between the mother's remarriage and the February 17, 1948, consensual decree of divorce incorporating the provisions of the September 4, 1947, separation agreement that "Albert's" parents contemplated much early remarriage and that the $25 weekly support award in the divorce decree would be for him alone. So, that figure constitutes some, but not conclusive, evidence of the mother's appraisal of the father's

then earning capacity and his limited ability to provide for his son.

However, that $25 weekly figure is today even less conclusive. For, the child is six years older, with consequent greater needs, and respondent's earnings and financial capacity have undoubtedly improved; although his remarriage, the birth of a daughter, and the illness of his second wife and that child constitute factors which also must be weighed in determining respondent's present ability to provide for the child of his first marriage.

The mother unconvincingly attempted to show that " Albert " will have extraordinary medical expenses. In an effort to sustain that contention she produced, and there was received in evidence, a series of receipted bills for hospital and medical expenses, the latest of which, however, is dated July 1, 1952 and the bulk of which relate to an appendectomy and glandular fever in 1949 and 1950. Those bills were received in evidence not as basis for reimbursement — which would not be within the jurisdiction of this court — but as bearing on the question whether " Albert " is in fact now likely to need extraordinary medical care.

At the close of the mother's testimony and again at the end of the whole hearing respondent's counsel moved to strike out all such evidence, but that motion was denied on the ground that it went to the weight, and not to the relevance, of the evidence.

Respondent, in turn, testified that during the several visits with him in the summer of 1952, at Long Island " Albert " had indulged in various forms of athletics, such as swimming, boating, basketball and baseball, and showed no signs of any cardiac or other physical impairment.

Furthermore, I ordered an examination of " Albert " by Dr. Henig, director of the medical division of this court, with the privilege to both counsel to inspect that report when filed. Dr. Henig's report of his September 15, 1953, examination has been filed, and it confirms my original impression as to the incredibility of the mother's testimony concerning " Albert's " present impaired health.

On the other hand, there was competent and credible evidence that respondent's daughter " Esther " is a sickly child, and that respondent has incurred, and may continue to incur, substantial medical expenses for her and his second wife.

Finally, while the mother's demands are excessive and her evidence in " Albert's " behalf unpersuasive, the father, in turn, attempted unduly to depreciate his ability to discharge adequately his obligation for " Albert's " support.

There was not available a complete audit of respondent's business as an accountant and insurance solicitor, conducted in a rent-free office with the assistance of two paid employees (as compared with only one in 1947). But concededly his 1952 net income (before taxes), as reported to the Collector of Internal Revenue, was $8,618.02 (as compared with about $4,000 in 1947), and there was a net of $7,342 ($141.20 per week) after payment of Federal and New York State income taxes. And that figure was computed by taking deductions (from a gross income of approximately $20,000) which include business entertainment expenses of $700. Admittedly, also, respondent is the owner, free and clear, of fifty shares of Container Corporation of America stock.

Respondent claimed that his accounting and insurance business has been falling off from loss of customers; but that is largely speculative, in view of the nature of the business and its apparent growth since 1947.

I am satisfied from the transcripts of accounts and other data produced for inspection pursuant to the direction in my September 1, 1953, indorsement that the savings bank accounts in respondent's second wife's name reflect her own earnings, both before and after the marriage, and that they are not subject to " Albert's " support claims, although their existence furnishes a reserve for any illness or other unusual expenses of respondent's second family and thereby enhances his ability to discharge his support obligation to the child of his first marriage.

After analyzing the evidence, considerable reflection, and personal research of the controlling authorities I have concluded that respondent has not overcome the statutory presumption (N. Y. City Dom. Rel. Ct. Act, § 131) that he has sufficient means to support the child of his first marriage, in a minimum amount of $35 a week.

For the foregoing reasons the court finds that " Albert " is entitled to support from the respondent father as alleged in the petition and on a means basis; and respondent is therefore hereby ordered and directed to pay into this court the following sums:

(a) The final order sum of $35 a week, beginning December 18, 1953, each and every week, until further order of the court;

(b) The temporary order sum of $25 due today;

(c) In addition, pursuant to the August 11, 1953, indorsement that any order might be retroactive under Family Court Rule XIV, the sum of $125 to cover the period from the date of the filing of the petition (July 30, 1953) to the September 4, 1953, first deposit of the temporary order sum of $25 a week. Said sum of $125 shall be deposited on or before noon on January 8, 1954.

(d) The foregoing directions are without prejudice to the mother's right to recover from the father, in an appropriate forum, any unpaid installments of $25 a week which accrued under the Florida divorce decree prior to July 30, 1953 (the date when this court's jurisdiction began).

(e) Inasmuch as no order for visitation is being made, for lack of subject-matter jurisdiction, respondent may, if he sincerely desires visitation and the mother will not co-operate, seek his remedy by habeas corpus in the Supreme Court.

Notice shall be given pursuant to the subjoined direction.